# United States Court of Appeals
## For the First Circuit

No. 25-1064

NAKIA WILSON, on their own behalf and of their deceased husband, Ryan Fortune; KIARA A. FORTUNE, on their own behalf and of their deceased father, Ryan Fortune, and as the legal representative of the Estate of Ryan Fortune; RYQUIA WILSON, on their own behalf and of their deceased father, Ryan Fortune, and as the legal representative of the Estate of Ryan Fortune; RYAN FORTUNE, JR., on their own behalf and of their deceased father, Ryan Fortune, and as the legal representative of the Estate of Ryan Fortune; RYQUAN FORTUNE, on their own behalf and of their deceased father, Ryan Fortune, and as the legal representative of the Estate of Ryan Fortune; STEPHANIE TOWNSEND, on their own behalf and of their underage son, CT; LAJUAN JOHNSON, on behalf of their son, RF, a minor who forms part of the Estate of Rawle Fortune; KIMBERLY LUCIANO, on behalf of their daughter, KS, a minor who forms part of the Estate of Rawle Fortune; CHARRITA WILLIAMS, on behalf of their son, JW, a minor who forms part of the Estate of Rawle Fortune; ARNOLD FORTUNE, on their own behalf as parent of the decedents; LUCILLE FORTUNE, on their own behalf as parent of the decedents,

Plaintiffs, Appellants,

v.

IGUANA SPORT SERVICES, CORP.,

Defendant, Appellee,

COURTYARD MARRIOTT ISLA VERDE BEACH RESORT; HR PROPERTIES, INC.; INTERNATIONAL HOSPITALITY ENTERPRISES, INC.; CHUBB INSURANCE COMPANY OF PUERTO RICO; INSURERS 1-10; UNKNOWN DEFENDANTS 1-10; INTERNATIONAL HOSPITALITY MANAGEMENT, INC.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. María Antongiorgi-Jordán, U.S. District Judge]

_____

Before

Barron, Chief Judge,
Breyer,[*] Associate Justice,
Gelpí, Circuit Judge.

_____

Jorge R. Quintana Lajara, with whom Pedro R. Vázquez, III, Pedro R. Vazquez, III PSC, and Quintana & Suárez, P.S.C., were on brief, for appellants.
José M. Martínez Chevres, with whom Martínez Chevres Law Office was on brief, for appellee.

_____

July 15, 2026

_____

---

[*] Hon. Stephen G. Breyer, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**GELPÍ, Circuit Judge.** This case presents questions of first impression regarding the heightened duty of care that applies to certain entities under Puerto Rico law. The central point of contention is whether an entity contracted to run the operation of a hotel's beach area owes a heightened duty of care to its guests.

Appellants are the family members of two deceased hotel guests who drowned in the ocean waters fronting the property. They brought this suit against a number of entities including Iguana Sport Services, Corp., ("Iguana"), which was contracted to provide beach and towel attendants for the hotel. According to Appellants, Iguana breached duties arising from its contractual obligations, a government permit, and the heightened standard of care established by Puerto Rico precedent, by failing to prevent the guests' tragic deaths. Appellants appeal from the district court's entry of summary judgment for Iguana based on the ground that Iguana had no duty to protect them. Because the outcome of this case turns on unresolved questions of Puerto Rico law regarding the applicability of the heightened duty of care, we certify the dispositive state law questions to the Puerto Rico Supreme Court. See P.R. Laws Ann. tit. 32, app. V, Rule 52.2(d).

## I. BACKGROUND

In reviewing the district court's grant of summary judgment to Iguana, we recite the facts in the light most favorable to the Appellants and draw all reasonable inferences in their

- 3 -

favor.  <u>See</u> <u>Axis Ins.</u> v. <u>Barracuda Networks, Inc.</u>, 160 F.4th 1, 4 (1st Cir. 2025).

## A. Facts

### 1. The Fortune Brothers

In November 2021, three couples traveled to Puerto Rico for a vacation at the Courtyard Marriott Isla Verde Beach Resort (the "Marriott"), a beachfront hotel located in the Municipality of Carolina.  The couples were: (1) Nakia Wilson and her husband, Ryan Fortune; (2) Stephanie Townsend and her husband, Rawle Fortune; and (3) Sean Devonish and his girlfriend, Stephanie Byers.

On the second day of their trip, the National Weather Service issued rip current warnings for beaches in Carolina, which were expected to remain in place for the following two days.  The couples received no communication from the Marriott, written or otherwise, regarding the ocean conditions.

That afternoon, they walked toward the Marriott beach area through an access point with no flags signaling dangerous ocean conditions.  No signs to that effect were present at the beach area either.  Unaware of the rip current warnings, Ryan and Rawle Fortune (the "Fortune brothers") went into the ocean fronting the Marriott.  Soon thereafter, their partners noticed them drifting away from the shore and ran to the front desk of the Marriott seeking help.  A Marriott employee came out of an office

and ran to the beach area with a life-saving device but took no further action. The Fortune brothers drowned.

## 2. Iguana

Because the beach-area operations involved more than Marriott personnel alone, we next describe Marriott's relationship with Iguana, a third-party contractor that provided services in that area.

Marriott is subject to Regulation 8856 of the Puerto Rico Tourism Company (the "Lodging Regulation"), which requires beach-front hotels to provide guests with beach lounge chairs and towels. P.R. Tourism Co., Regul. 8856, ch. II, art. 7(A)(7) (Nov. 22, 2016). To satisfy these obligations, in 2011 Marriott entered into a contract with Iguana whereby Iguana undertook the obligation to provide towel and beach attendants for the hotel. The contract imposed no other specific obligations on Iguana.

On a day-to-day basis, Iguana's employees wear Marriott uniforms and perform tasks such as cleaning the pool and beach area and setting up beach chairs and umbrellas for hotel guests. Iguana charges Marriott a management fee based on the number of employees needed.

Marriott does not possess certain permits and licenses required for engaging in its beach-related commercial activities, but Iguana holds them in its place. To that end, Iguana possesses a permit issued by the Puerto Rico Department of Natural and

Environmental Resources (DNER) to operate in the maritime-terrestrial zone fronting the Marriott (the "DNER Permit"). Iguana also holds an "Itinerant Business" license issued by the Municipality of Carolina for the provision of massage services and beach gear rentals (the "Municipality's License").

## B. Procedural History

Appellants are family members of the Fortune brothers.[1] In November 2022, they filed a complaint against Marriott; HR Properties, Inc.; International Hospitality Enterprises, Inc.; Chubb Insurance Company of Puerto Rico; and other unknown defendants, in the United States District Court for the District of Puerto Rico. Appellants later filed an amended complaint adding International Hospitality Management, Inc. ("IHM") and Iguana as defendants. Appellants claimed that the Marriott, IHM, and Iguana

---

[1] Appellants are Nakia Wilson, widow of Ryan Fortune, on her own behalf and on behalf of Ryan Fortune; Kiara A. Fortune, daughter of Ryan Fortune, on her own behalf and as an heir and representative of the Estate of Ryan Fortune; Ryquia Wilson, daughter of Ryan Fortune, on her own behalf and as an heir and representative of the Estate of Ryan Fortune; Ryan Fortune, Jr., son of Ryan Fortune, on his own behalf and as an heir and representative of the Estate of Ryan Fortune; Ryquan Fortune, son of Ryan Fortune, on his own behalf and as an heir and representative of the Estate of Ryan Fortune; Stephanie Townsend, common law wife of Rawle Fortune, on her own behalf and of her son, CT; Lajuan Johnson, on behalf of her son, RF, who forms part of The Estate of Rawle Fortune; Kimberly Luciano, on behalf of her daughter, KS, of The Estate of Rawle Fortune; Charrita Williams, on behalf of her son, JW, of The Estate of Rawle Fortune; Arnold Fortune, father of the Fortune brothers; and Lucille Fortune, mother of the Fortune brothers.

breached the heightened duty of care that hotels owe to their guests under Puerto Rico law, as well as the duties imposed on lodging entities under Article 7 of the Lodging Regulation. See Regul. 8856, ch. II, art. 7(A)(7). According to Appellants, said breaches consisted of failing to warn guests of the dangerous ocean conditions, educate them about the proper use of the beach, and provide them with flotation equipment or beach safety personnel. These failures, they argued, ultimately led to the deaths of the Fortune brothers.

In June 2024, Appellants settled with all defendants except Iguana. The case proceeded to discovery, after which Iguana moved for summary judgment. Iguana argued that it had no duty, arising from its agreement with Marriott or otherwise, to warn or protect the Fortune brothers from dangerous ocean conditions. In support of this argument, Iguana asserted that its responsibilities under its agreement with Marriott did not entail the operation of the hotel. Rather, its responsibilities were limited to providing pool and beach attendants, who were only tasked with duties such as cleaning the pool and beach area and providing umbrellas and towels to guests. Providing lifeguards or security personnel, Iguana emphasized, was not part of the agreement. Further, it asserted that neither the DNER Permit nor the Municipality's License required it to provide these services or implement these measures, either.

Appellants opposed the entry of summary judgment. As a matter of law, they argued that Iguana owed the Fortune brothers a duty of care under its agreements with Marriott, the DNER Permit, and Puerto Rico's negligence laws.

The district court granted summary judgment for Iguana and dismissed Appellants' claims with prejudice. The court held that Iguana did not owe a duty of care to the Fortune brothers under its agreement with Marriott, the heightened duty of care imposed upon innkeepers under Puerto Rico law, the DNER Permit, the Municipality's License, or a traditionally recognized duty of care.

Appellants appealed the first three determinations.[2]

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment and its statutory and regulatory interpretations de novo. John B.

---

[2] Appellants do not challenge the district court's determination that the Municipality's License did not impose any affirmative duties on Iguana to protect Marriott guests, so we do not consider that here. As to the court's decision regarding the traditionally recognized duty of care, Appellants make merely conclusory arguments regarding its duty to protect guests from a "forseeab[le]" harm. They fail to flesh out a claim that is separate from the heightened duty of care claim with either law or argument, providing no guidance as to how Iguana failed to "act as would a prudent and reasonable person under the circumstances." Vázquez-Filippetti v. Banco Popular de P.R., 504 F.3d 43, 49 (1st Cir. 2007). As such, this argument is waived for lack of development. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Cruz Constr. Co. v. Beacon Comtys. Corp., 169 F.4th 89, 95 (1st Cir. 2026); Jette v. United of Omaha Life Ins., 18 F.4th 18, 26 (1st Cir. 2021) (quoting United States v. Strong, 724 F.3d 51, 55 (1st Cir. 2013)). Summary judgment is proper if, based on the record, there is no genuine dispute of material fact, i.e., "if there is no factual determination which a rational factfinder could make as to the existence or nonexistence of a fact that has the potential to change the outcome of the suit -- such that the moving party is entitled to judgment as a matter of law." Axis, 160 F.4th at 5 (quoting Ithier v. Aponte-Cruz, 105 F.4th 1, 6 (1st Cir. 2024)); see also Fed. R. Civ. P. 56(a).

Because this case is based on diversity jurisdiction and involves only state law claims, "we look to federal law for the summary judgment framework and to state law for the substantive rules of decision." Axis, 160 F.4th at 6 (citation modified). In interpreting state law, we look to Puerto Rico Supreme Court precedent. Hosp. San Antonio, Inc. v. Oquendo-Lorenzo, 47 F.4th 1, 7 (1st Cir. 2022). Where, as here, the Puerto Rico Supreme Court has not yet addressed certain issues before us, we must anticipate how it would resolve them. Id. In doing so, we look to the relevant statutory and regulatory language, as well as analogous decisions of Puerto Rico's highest court. Id.

### III. DISCUSSION

Appellants argue that the district court erred in holding that Iguana did not owe a duty of care to the Fortune brothers. According to Appellants, though, this duty arose from (1) Marriott's express and implied agreements with Iguana; (2) the DNER Permit; and (3) the heightened duty of care imposed upon certain entities under Puerto Rico law.[3]

A legal duty may arise from one of several sources: (1) "by a statute, regulation, ordinance, bylaw or contract"; (2) "as the result of a traditionally recognized duty of care particular to the situation"; or (3) "as the result of a special relationship between the parties that has arisen through custom," De-Jesus-Adorno v. Browning Ferris Indus. of P.R., Inc., 160 F.3d 839, 842 (1st Cir. 1998), such as hotel-guest, school-student, and hospital-patient relationships, see Elba A.B.M. v. Univ. of P.R., 125 D.P.R. 294, 308, P.R. Offic. Trans. (1990). At issue here are

---

[3] Appellants also argue that the district court erred in excluding certain lay witness statements under the Federal Rules of Evidence. Because we are certifying a question to the Puerto Rico Supreme Court that centers on the principal issue on appeal, i.e., Iguana's duties towards Marriott guests, we need not address the admissibility of the witness's statements now.

various duties arising from the first and third sources.  We address each in turn.

### A. The Agreements Between Marriott and Iguana

Appellants first contend that Iguana had a legal duty to provide safety to Marriott guests arising from its express and implied agreements with Marriott.  According to Appellants, that duty stemmed both from Iguana's written agreement with Marriott and from additional responsibilities Iguana undertook throughout the course of their business relationship.  Like the district court, we are unpersuaded.

Contractual duties may arise from both express and implied agreements.  See Mattei Nazario v. Vélez & Asociados, 145 D.P.R. 508, 521, P.R. Offic. Trans. (1998).  Here, however, no record evidence supports the conclusion that Iguana agreed -- either expressly or impliedly -- to provide for the safety of Marriott guests.

Appellants first argue that, under its written contract with Marriott, Iguana was tasked with managing the operation of the hotel's beach area.  By taking on this role, the argument goes, Iguana assumed the duty of providing security to Marriott guests there.  This argument paints with too broad a stroke.  As the district court correctly observed, Iguana's duties under the written contract were limited to providing beach and towel attendants to Marriott.  There was no provision requiring Iguana

to protect Marriott guests, such as a provision regarding security personnel, lifeguards, medical personnel, or safety equipment, in the contract. As such, the written agreement did not impose upon Iguana a duty to protect Marriott guests.

The parties' course of dealing does not fill in that gap either. Appellants next argue that Iguana undertook more responsibilities than the written contract shows, and that these amounted to an implied agreement under which Iguana assumed Marriott's responsibilities for the operation of the beach area, which included warning guests of dangerous ocean conditions and providing emergency services to them. They point to the fact that Iguana employees participated in tasks such as "cleaning the pool deck, straightening out the chairs, [providing] umbrellas in the pool area, . . . putting out beach chairs and beach umbrellas," and offering guests "masks, snorkels, and other aquatic equipment," all of which were not in the written agreement.[4] None of these tasks, however, suggest that the parties implicitly agreed

---

[4] Appellants also seem to contend that the use of Marriott uniforms by Iguana employees supports a finding that Iguana assumed Marriott's safety duties over the beach area. Appellants base this argument on the "apparent principal" doctrine, under which "an apparent principal may be held liable for the acts of its apparent agent where the apparent principal's actions led the plaintiffs to reasonably believe in its representation of authority and control over the apparent agent." Grajales-Romero v. Am. Airlines, Inc., 194 F.3d 288, 293 (1st Cir. 1999) (citation modified). Because Marriott would be the apparent principal subject to liability here, and not Iguana, the argument is inapposite. See id.

that Iguana would be responsible for ensuring guest safety on the beach area. And the record evidence does not support a finding to that effect, either.

Take, for example, Sandra Santos's sworn deposition. As the head of security at the Marriott, Santos avowed that whenever the National Weather Service issues an alert, the general manager of the Marriott determines whether guests will be notified and chairs and umbrellas will be removed from the beach area. The security team then executes the measures directed by the general manager. Santos also stated that when emergencies arise in the beach area, the front desk staff informs the security team, rather than any other group or entity working at the hotel. The security team then responds to the scene and provides any necessary aid to those involved.

The same is not true for Iguana employees. As Eddie Rivera, president of Iguana, stated in his deposition, Iguana was not hired to assist in emergencies, and its employees do not have the training to do so. Although (according to deposition testimony by Santos and Iguana employee Pedro Pagán) Iguana employees every so often inform guests about adverse ocean conditions, these actions alone do not amount to an implied contractual obligation to provide security to guests. The fact that the security team and Iguana employees maintained communications that were later divulged to hotel guests does not, by itself, show that Iguana was

under an implied agreement with Marriott to implement measures to prevent emergency situations, let alone to provide assistance in any such situation.

Because no duty to provide for the safety of hotel guests was imposed on Iguana under its agreements with Marriott, Iguana is entitled to summary judgment as a matter of law on this basis.

## B. The DNER Permit

We turn to Appellants' second argument. They contend that the district court erred in holding that the DNER Permit imposed a duty on Iguana to protect Marriott guests. Recall that the DNER Permit authorizes Iguana to use a space of the maritime-terrestrial zone for commercial purposes.[5] To operate in this zone, Iguana must comply with certain terms and conditions. Appellants specifically point to Condition 22 of the permit, which provides that Iguana will "be responsible for the cleanliness, maintenance, and <u>safety</u> of the <u>area</u> during the time authorized for operation." (Emphasis added). And to Condition 28, which recognizes that Iguana's "business will be subject to <u>weather conditions</u>," and thus, it "will be responsible for exercising prudence in <u>climatic conditions</u> that may become adverse."

_____

[5] The maritime-terrestrial zone is defined under the Dock and Harbor Act of Puerto Rico of 1968 as "the space of the coasts of Puerto Rico touched by the sea during its ebb and flow, where tides are noticeable, and where the largest waves during a storm are felt in places where tides are not noticed." P.R. Laws Ann. tit. 23, § 2103(n).

- 14 -

(Emphasis added). They argue that, under these conditions, Iguana acquired a "separate, direct[,] and independent" duty to provide for the safety of the Fortune brothers in the ocean area. We disagree.

Our analysis of both arguments begins, and ends, with the language of the permit. Cf. Banco Bilbao Vizcaya v. Commonwealth of Puerto Rico, 195 D.P.R. 39, 95 P.R. Offic. Trans. 4, 7 (2016) (explaining that, in construing the meaning of a statute, courts must first look to its text); Marcial v. Tomé, 144 D.P.R. 522, 536, P.R. Offic. Trans. (1997) (explaining that, if the terms of a contract are clear and leave no doubt as to the intention of the parties, courts must observe their literal sense).

We will take each one at a time. Appellants point to Condition 22 (responsibility for the safety of the area) to argue that it creates a duty to protect guests that is "not limited to the 250 [square feet] of sand where the chairs are located," but rather extends to the ocean area fronting the hotel.[6] In making this argument, however, Appellants ignore other provisions in the permit that set forth the limits of the "area" where Iguana is responsible for providing "safety." The DNER Permit provides that Iguana's "occupancy space" is limited to 250 square feet.

---

[6] Although Appellants refer to "250 meters" in their brief, we take this to be a typographical error, as the DNER Permit limits the area where the chairs must be placed to 250 square feet, not meters.

- 15 -

Condition 1, in turn, establishes that Iguana is only authorized to "use a total of" that square footage. Moreover, Condition 4 provides that "[d]uring the validity of [the permit], it will not be possible to carry out extensions that imply a greater area of occupation on the lands" of the maritime-terrestrial zone, without prior authorization from the DNER. (Emphasis added). Reading these conditions together, it is clear that the permit uses the terms "space" and "area" interchangeably to refer to the 250 square feet of sand where Iguana may operate. Thus, Iguana's obligation to provide for the "safety" of the "area" was limited to those boundaries. Appellants' argument that Iguana's duty under Condition 22 went beyond that square footage, extending to the ocean, fails.

Next, Appellants point to Condition 28 (responsibility for exercising prudence in adverse climatic conditions) and argue that rip currents fall under the "weather conditions" that Iguana's business was subject to, and had to "excercis[e] prudence" in. As such, they contend that after the National Weather Service issued the warnings, Iguana had to implement safety measures, such as displaying warning signs and closing the beach operations, and had to provide emergency services to guests. Its failure to do so,

- 16 -

they argue, breached the duties imposed upon it under the permit. We are not persuaded.

As laid out above, Iguana's obligations under the DNER Permit extend only to the portion of the maritime-terrestrial zone Iguana is authorized to operate in. Accordingly, Iguana's responsibilities under Condition 28 are limited to responding to adverse climatic conditions that arise in that space, which does not include the ocean. Taking the language of the permit's terms, we conclude that Iguana had no duty to protect hotel guests from the dangers of the ocean under Condition 28.

Appellants' argument that the district court erred in holding that Iguana had no duty to protect the Fortune brothers under the DNER Permit therefore fails.

## C. Heightened Duty of Care

Lastly, Appellants claim that the district court incorrectly determined Iguana did not owe a heightened duty of care to Marriott guests. On this point, the Court understands Appellants' argument to be two-fold. First, they contend that Iguana assumed the responsibilities of an "innkeeper" under Puerto Rico law by taking over Marriott's beach-area operations, and thus, it owes hotel guests a heightened duty of care in that area. See P.R. Laws Ann. tit. 10, § 711(b). Second, they argue that, even if not considered an "innkeeper" under the relevant statute, because Iguana operates in an area adjacent to the ocean, which

may pose dangers to the individuals it provides services to, it has the duty to protect and assist them if dangerous conditions arise. Given the nature of its services, the argument goes, Iguana must be held to a heightened standard of care.

To prevail on a negligence claim under Puerto Rico law, a plaintiff must first establish that the defendant owed him or her a duty of care. Blomquist v. Horned Dorset Primavera, Inc., 925 F.3d 541, 547 (1st Cir. 2019) (quoting Woods-Leber v. Hyatt Hotels of P.R., Inc., 124 F.3d 47, 50 (1st Cir. 1997)). With respect to that first element, the Puerto Rico Supreme Court has identified schools, hospitals, and hotels as entities that, given the "essential nature" of the activities they perform, must be held to a heightened standard of care. Elba, 125 D.P.R. at 320, P.R. Offic. Trans. (emphasis omitted). Relevant here, hotels and innkeepers, though not "absolute insurers of their guests' well-being . . . must ensure that the areas to which [their] guests have access are safe." Blomquist, 925 F.3d at 547 (first citing Woods-Leber, 124 F.3d at 51; and then citing Cotto v. C.M. Ins., 116 D.P.R. 644, P.R. Offic. Trans 786, 793 (1985)); see Baum-Holland v. Hilton El Con Mgmt., LLC, 964 F.3d 77, 88 (1st Cir. 2020) (discussing the heightened duty of care hotels owe their guests); Woods-Leber, 124 F.3d at 51 (discussing the same for innkeepers).

Under Puerto Rico law, a "hotel" is defined as "any place of shelter operated for profit [that provides] protection for persons and property." P.R. Laws Ann. tit. 10, § 711(a) (second alteration in original). An "innkeeper," in turn, is "any person, firm, corporation, or other type of business organization, engaged for profit, in the operation of a hotel." P.R. Laws Ann. tit. 10, § 711(b) (emphasis added). The first question on this subject, then, is whether Iguana may assume the responsibilities of an innkeeper by running the operation of a limited area adjacent to the Marriott.

As noted above, Iguana is tasked with providing towel and beach attendants to Marriott in a specific space of the beach area adjacent to it, see supra Section III.A-B. On its face, the text of the statute does not provide clear guidance on what "operati[ng]" a hotel entails. P.R. Laws Ann. tit. 10, § 711(b). Nothing in the text indicates whether the definition may extend to entities tasked with providing services in limited areas of a hotel. See id. § 711. Moreover, neither party cites any legislative history affording additional insight into this question, nor have we found any. See Banco Bilbao, 195 D.P.R. 39, 95 P.R. Offic. Trans. at 7 ("Only before a textual ambiguity should courts fulfill the legislative purposes." (quoting Cruz Parrilla v. Departamento de la Vivienda, 184 D.P.R. 393, 404, P.R. Offic. Trans. (2012)). And Puerto Rico caselaw sheds no further light on

- 19 -

this either.  See e.g. Pabón Escabí v. Axtmayer, 90 D.P.R. 20, Offic. Trans. (1964) (imposing liability on a defendant who was both the owner and innkeeper of a hotel for an assault committed on a guest by a third party).  Although the statute may be read to suggest that the term "innkeeper" only refers to persons or entities that run the entirety of a hotel's operations, we lack sufficient guidance to definitively conclude this.  As such, we cannot anticipate how the Puerto Rico Supreme Court would solve the question as to whether an entity such as Iguana could assume the responsibilities of an "innkeeper" for the area it operates in.

Appellants' second argument similarly leaves us with an interpretive gap.  Besides schools, hospitals, and hotels, the Puerto Rico Supreme Court has not named other entities or institutions subject to a heightened standard of care.  It has, however, distinguished those entities from "contractor[s]" or "business[es] whose scope of activity does not encompass the need to provide said protection."  Montalbán v. Centro Comercial Plaza Carolina, 132 D.P.R. 785, 793, P.R. Offic. Trans. (1993) (emphasis added) (quoting Estremera v. Inmobiliaria Rac, Inc., 109 D.P.R. 852, 855-56 (1980)).  In our view, the court seems to have left open the possibility that other entities may also be held to a stringent standard of care, dependent on the nature of the activities they undertake.

Appellants' argument that, given the nature of the services it provides, Iguana must be held to a heightened standard of care, therefore, is not necessarily foreclosed by Puerto Rico caselaw. But no precedent leads us to definitively conclude that a heightened duty of care applies to Iguana either.

For the foregoing reasons, we cannot anticipate how the Puerto Rico Supreme Court would rule on either of these matters. Carrasquillo-Ortiz v. Am. Airlines, Inc., 812 F.3d 195, 199-200 (1st Cir. 2016). And answering those questions ourselves would offend the comity due to Puerto Rico courts. Id. (quoting Santiago-Hodge v. Parke Davis & Co., 859 F.2d 1026, 1033 (1st Cir. 1988)). Because these local issues of law are outcome-determinative for Appellants' negligence claim against Iguana, we believe the best course is to certify both questions to the Puerto Rico Supreme Court. See P.R. Laws Ann. tit. 32, app. V, Rule 52.2(d).

**IV. CONCLUSION**

Accordingly, we hereby **certify** the following questions to the Puerto Rico Supreme Court:

1. Under Puerto Rico law, can an entity tasked with providing services in a limited area adjacent to a hotel assume the responsibilities of an "innkeeper" for that area?

2. Under Puerto Rico law, does an entity contracted to run the operation of a hotel's beach area owe a heightened duty of care to hotel guests based on the nature of its services?

We would also welcome any further guidance from the Puerto Rico Supreme Court on any other aspect of Puerto Rico law that it understands would aid in the proper resolution of these issues. See Nicholls v. Veolia Water Cont. Operations USA, Inc., 144 F.4th 354, 359 (1st Cir. 2025).

The Clerk of this court is directed to forward to the Puerto Rico Supreme Court, under the official seal of this court, a copy of the certified questions and our opinion in this case, along with copies of the briefs and appendix filed by the parties. We retain jurisdiction over this appeal pending resolution of the certified questions.